**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Petitioner,<br><br>- v -<br><br>TAPESTRY MANAGEMENT SERVICES, INC., *et al.*,<br><br>Respondents. | x<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>x | 26 Misc. 545 |

**MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S PETITION TO ENFORCE CIVIL INVESTIGATIVE DEMANDS 26-014, 26-015, 26-016, 26-017, AND 26-036**

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007
Telephone: (212) 637-2699

Of Counsel:

RACHAEL DOUD
CHIBOGU NZEKWU
Assistant United States Attorneys

# TABLE OF CONTENTS


PAGE

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ....................................................................................................3

A. Medicare's Reimbursement of Chronic Care Management, Remote Physiological Monitoring, and Behavioral Health Integration Services ..........................................3

B. The False Claims Act....................................................................................4

C. Tapestry's Business and Submission of Claims to Medicare ...................................5

D. The Civil Fraud Investigation Team's Investigation and the CIDs ............................7

E. CMS's Suspension of Payments to Certain Tapestry Entities...................................9

F. Tapestry Stops Complying with the CIDs ............................................................10

ARGUMENT..........................................................................................................12

I. The Standard for CID Enforcement Under the FCA ...............................................13

II. The Government Is Entitled to Enforcement of the CIDs ......................................15

A. The CIDs Were Lawfully Issued Pursuant to the FCA.........................................15

B. The Documents Sought Are Relevant to the Matter Under Investigation and Not Already in the Government's Possession .......................................................16

C. It Is Not Unduly Burdensome for Tapestry to Produce Responsive Materials......21

CONCLUSION......................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Pharm. Ass'n v. U. S. Dep't of Just., Antitrust Div.*,

344 F. Supp. 9 (E.D. Mich. 1971) ........................................ 16

*Cook County v. United States ex rel. Chandler*,

538 U.S. 119 (2003) ........................................ 15

*EEOC v. Kloster Cruise Ltd.*,

939 F.2d 920 (11th Cir. 1991) ........................................ 14

*Federal Election Comm'n v. Larouche Campaign*,

817 F.2d 233 (2d Cir.1987) ........................................ 14

*Finnell v. U.S. Dep't of Just.*,

535 F. Supp. 410 (D. Kan. 1982) ........................................ 16

*FTC v. Texaco*,

555 F.2d 862 (D.C. Cir. 1977) ........................................ 21

*In re McVane*,

44 F.3d 1127 (2d Cir. 1995) ........................................ 14, 16

*Mikes v. Straus*,

274 F.3d 687 (2d Cir. 2001) ........................................ 5

*Oklahoma Press Publishing Co. v. Walling*,

327 U.S. 186 (1946) ........................................ 21

*Sandsend Fin. Consultants, Ltd. v. Fed. Home Loan Bank Bd.*,

878 F.2d 875 (5th Cir. 1989) ........................................ 17

*SEC v. Brigadoon Scotch Distr. Co.*,

480 F.2d 1047 (2d Cir. 1973) ........................................ 21

*United States ex rel. Fam. Clinic of New Albany v. Chartspan Med. Techs.*,
No. 21 Civ. 139 (GHD) (JMV), 2025 WL 2375415 (N.D. Miss. Aug. 14, 2025) ...................... 5

*United States ex rel. Time Warner, Inc.*,
No. MISC.A. 94–338(HHG), 1997 WL 118413 (Jan. 22, 1997 D.D.C.) ................................ 21

*United States v. Firestone Tire & Rubber Co.*,
455 F. Supp. 1072 (D.D.C. 1978) ........................................................................... 21, 24

*United States v. Markwood*,
48 F.3d 969 (6th Cir. 1995) .................................................................................. 13, 14

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950) ........................................................................................ 13, 14, 16

*United States v. Omnicare, Inc.*,
No. 1:15-CV- 4179 (CM), 2021 WL 1063784 (S.D.N.Y. Mar. 19, 2021) ................................ 5

*United States v. Powell*,
379 U.S. 48 (1964) ............................................................................................... 2, 14

*United States v. Watson*,
No. 23-CR-82 (EK), 2023 WL 11952996 (E.D.N.Y. July 28, 2023) .................................. 2, 23

*United States v. Witmer*,
835 F. Supp. 208 (M.D. Pa. 1993) ........................................................................... 2, 24

**Statutes**

31 U.S.C. § 3729 ................................................................................................... 1, 16

31 U.S.C. § 3729(a)(1)(A) ....................................................................................... 4, 15

31 U.S.C. § 3729(a)(1)(B) ....................................................................................... 4, 15

31 U.S.C. § 3729(a)(1)(G) .......................................................................................... 4

31 U.S.C. § 3730(a) ................................................................................................... 15

31 U.S.C. § 3733 ........ 16

31 U.S.C. § 3733(a) ........ 15

31 U.S.C. § 3733(a)(1) ........ 1, 8, 15

31 U.S.C. § 3733(j) ........ 1

31 U.S.C. § 3733(j)(1) ........ 15

31 U.S.C. § 3733(j)(2)(A) ........ 16

42 U.S.C. §§ 1395j–1395w-4 ........ 3

**Regulations**

42 C.F.R. § 405.371(a)(2) ........ 10

42 C.F.R. § 405.372(a)(4) ........ 10

42 C.F.R. § 410.26(a)(3) ........ 4

81 Fed. Reg. 80170 ........ 3, 4

82 Fed. Reg. 52976 ........ 4

83 Fed. Reg. 59452 ........ 3

## PRELIMINARY STATEMENT

By this petition, the United States (the "Government") seeks to enforce civil investigative demands ("CIDs") that it lawfully served pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA"). The FCA authorizes the Government to serve requests for documents and responses to interrogatories on those it has reason to believe may be in possession of material relevant to an FCA investigation. *Id.* § 3733(a)(1). The FCA further authorizes the Government to file a petition for an order for the enforcement of a CID "[w]henever any person fails to comply with [the CID]." *Id.* § 3733(j). Respondents Tapestry Management Services, Inc., Tapestry Telehealth PLLC, Chess Medicine PLLC, Chess Medical PC, and Topaz Bay Senior Health PC (collectively, "Tapestry") are refusing to comply with the Government's CIDs. Tapestry has no valid basis to do so and the Court should therefore issue an order compelling Tapestry to respond to the CIDs.

Tapestry provides purported medical services to patients in skilled nursing facilities and bills Medicare and Medicaid for those services. These services are provided remotely and generally do not include any face-to-face interactions between Tapestry and the patients. While the Government covers certain such remote patient services under Medicare Part B in order to help manage patient health outside of patient visits, reimbursement is permitted only where *bona fide* services are actually performed and specific requirements are met. Since 2020, Tapestry entities have submitted numerous claims for such services, billing Medicare Part B alone over $800 million and being paid approximately $248 million. The United States Attorney's Office for the Southern District of New York ("SDNY USAO"), the United States Attorney's Office for the Central District of California, and the United States Department of Justice, Civil Division, Commercial Litigation Branch, Fraud Section (the "Civil Fraud Investigation Team") are investigating whether Tapestry (or any of its executives, officers, or employees) violated the FCA by submitting or causing the submission of false or fraudulent claims to Medicare and other government healthcare programs in connection with billing of these services.

In furtherance of this investigation, in April 2026, the SDNY USAO served CIDs on four Tapestry entities. *See* Declaration of Rachael Doud ("Doud Decl.") Exs. A through D. In August 2026, the SDNY USAO served CIDs on an additional Tapestry entity. *Id.* Ex. E. Tapestry has never disputed that the SDNY USAO lawfully issued the CIDs or that they seek relevant material, and it initially worked with the Civil Fraud Investigation Team to produce responsive materials. More recently, however, Tapestry has suspended its efforts to respond to the CIDs. Counsel for Tapestry has communicated to the Civil Fraud Investigation Team that Tapestry made a business decision to suspend compliance. Tapestry is not permitted to unilaterally elect not to comply with lawfully issued CIDs.

Enforcement of an FCA CID is proper as long as the district court finds that: (i) the inquiry is within the authority of the issuing agency; (ii) the information sought is reasonably relevant to that inquiry and not already in the issuing authority's possession; and (iii) the requests are not too indefinite or unduly burdensome. *See generally United States v. Powell*, 379 U.S. 48, 57-58 (1964) (describing the standard of review for enforcing an administrative subpoena issued by Internal Revenue Service); *see also United States v. Witmer*, 835 F. Supp. 208, 220-21 (M.D. Pa. 1993) (adopting the *Powell* standard for enforcing a CID under the FCA). The Government's CIDs easily meet this standard. And while Tapestry may argue that its financial situation impedes its ability to respond to the CIDs, that is not a valid basis to refuse to produce any responsive materials. *See, e.g.*, *United States v. Watson*, No. 23-CR-82 (EK), 2023 WL 11952996, at *9 (E.D.N.Y. July 28, 2023) (noting that recipient of grand jury subpoena "is neither the first corporation, nor even the first corporation in some state of financial distress, to receive a subpoena. The obligation to respond fully and promptly remains in such cases"). Moreover, in light of the fact that Tapestry has been paid hundreds of millions of dollars by Medicare alone in the past several years, a purported lack of resources to respond to the CIDs would raise concerns about dissipation of assets, rendering the Civil Fraud Investigation Team's investigation particularly time sensitive.

Accordingly, the Court should grant the petition and order Tapestry to provide the materials

sought. So that the Government receives the highest-priority material on an expedited basis, it also requests that the Court order a specific schedule for Tapestry to respond to certain requests that the Government has prioritized.

## BACKGROUND

### A. Medicare's Reimbursement of Chronic Care Management, Remote Physiological Monitoring, and Behavioral Health Integration Services

In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain health care services provided to eligible beneficiaries. CMS, an agency of HHS, administers the Medicare program. *See* CMS, About Us, *available at* https://www.cms.gov/about-cms ("CMS is the federal agency that provides health coverage to more than 160 million through Medicare, Medicaid, the Children's Health Insurance Program, and the Health Insurance Marketplace") (last accessed November 3, 2026). Medicare has several parts, including Part B, which provides coverage for outpatient medical services, including chronic care management ("CCM"), remote physiological monitoring ("RPM"), and behavioral health integration services ("BHI"), so long as those services are provided in conformity with applicable Medicare requirements. *See generally* 42 U.S.C. §§ 1395j–1395w-4; 81 Fed. Reg. 80170, 80251 (Nov. 15, 2016); 83 Fed. Reg. 59452, 59492 (Nov. 23, 2018); 81 Fed. Reg. at 80230.

CCM services include care management activities for beneficiaries with chronic conditions, such as revisions of care plans and reviews of laboratory and other studies. 81 Fed. Reg. at 80251; *see* CMS, Chronic Care Management Services, *available at* https://www.cms.gov/files/document/chroniccaremanagement.pdf (last accessed November 3, 2026). RPM services include remote monitoring of patients' vital signs and other physiological data. 83 Fed. Reg. at 59492; *see* CMS, Remote Patient Monitoring, *available at* https://www.cms.gov/medicare/coverage/telehealth/remote-patient-monitoring (last accessed November 3, 2026). BHI services include care management services for patients with mental, behavioral, or psychiatric health conditions. 81 Fed. Reg. at 80230; *see* CMS, Behavioral

Integration Services, *available at* https://www.cms.gov/files /document/mln909432-behavioral-health-integration-services.pdf (last accessed November 3, 2026). These services do not generally involve ongoing face-to-face interactions between the healthcare provider and the patient. For this reason and others, CMS has imposed specific requirements that providers must meet in order to obtain reimbursement from Medicare for these services. For example, the patient must receive an initiating visit with the provider if they have not been seen by them in the last year (or, for RPM, the patient must have had an established relationship with the provider), the patient must consent to the services, and the services must be provided under the supervision of the treating physician. 81 Fed. Reg. at 80245-51; 82 Fed. Reg. 52976, 53014 (Nov. 15, 2017); 81 Fed. Reg. at 80239-40; 42 C.F.R. § 410.26(a)(3) & (b)(5).

Each time that a provider submits a Part B claim for reimbursement to Medicare for these services, the provider must also make a series of certifications regarding the services being provided. *See* CMS Form-1500 (rev. 02/12). Those certifications include that the claim "complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment [ ]." *See* CMS Form 1500, *available at* https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms1500.pdf (last accessed November 3, 2026).[1]

### B. The False Claims Act

The FCA imposes civil liability on "any person" who, *inter alia*, knowingly "presents [] a false or fraudulent claim" to the Government, 31 U.S.C. § 3729(a)(1)(A); "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B); or "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay … the Government." 31 U.S.C. § 3729 (a)(1)(G).

[1] In addition to Medicare Part B, Tapestry submitted claims to Medicare Advantage health plans (under Medicare Part C), Tricare, and Medicaid. The Government is also investigating whether Tapestry violated the FCA in connection with claims to those Government programs.

FCA liability may arise where an entity or person knowingly submits false claims to Medicare for services that did not conform to relevant Medicare program requirements. *See, e.g.*, *United States v. Omnicare, Inc.*, No. 1:15-CV- 4179 (CM), 2021 WL 1063784, at *1 (S.D.N.Y. Mar. 19, 2021) (denying motion to dismiss FCA claims where the Government alleged that the defendant submitted claims for prescription drugs to Medicare, in violation of program requirements); *United States ex rel. Fam. Clinic of New Albany v. Chartspan Med. Techs.*, No. 21 Civ. 139 (GHD) (JMV), 2025 WL 2375415, at *5 (N.D. Miss. Aug. 14, 2025) (denying motion to dismiss FCA claims where a defendant allegedly, among other things, did not provide CCM services under the necessary general supervision of a licensed medical provider). Further, FCA liability may also arise where "the performance of the service is so deficient that for all practical purposes it is the equivalent of no performance at all." *Mikes v. Straus*, 274 F.3d 687, 703 (2d Cir. 2001), *abrogated on other grounds by Universal Health Servs., Inc. v. United States*, 579 U.S. 176 (2016).

**C. Tapestry's Business and Submission of Claims to Medicare**

Dr. David Chess and Mordechai Eisenberg founded Tapestry, beginning with Tapestry TeleHealth PLLC, in 2017 as a medical practice that provided medical professionals and certain support to skilled nursing facilities. *See generally* Doud Decl. Ex. F at 5, 9. Over time, Tapestry shifted its focus to CCM, RPM, and BHI. *Id.* at 8-10. Tapestry's business model involves contracting with skilled nursing facilities to provide such services, for which Tapestry's clinical entities then bill Medicare directly, as further described below. *See id.*; https://tapestryhealth.com /about-us/ (last accessed November 3, 2026). The facilities provide Tapestry with access to patients' medical records, and Tapestry then extracts information from the records and puts it into reports, which it provides to the facilities. Doud Decl. Ex. F at 9. In the case of RPM, Tapestry also receives information, including patients' vital signs, from digital

devices located in the facilities. *Id.* Tapestry uses its platform TapestryHealth, which Tapestry describes as a "cloud-based, Software-as-a-Service (SaaS) platform that uses predictive AI," to compile the reports. *See* tapestryhealth.com. Tapestry previously contracted with a third party, BetCo LTC Consulting, LLC, to extract information from patients' medical records and prepare the reports. *See* Doud Decl. ¶ 4.

Tapestry Management Services, Inc. operates several clinical entities that provide the purported medical services at issue and bill Medicare. These clinical entities include Tapestry Telehealth PLLC, Topaz Bay Senior Health PC, Chess Medicine PLLC, and Chess Medical PC. Doud Decl. Ex. F at 4-5. Dr. David Chess owns 100% of Tapestry Telehealth PLLC, Chess Medicine PLLC, and Chess Medical, PC. *Id.* at 7-8. Another doctor owns 100% of Topaz Bay Senior Health, PC. *Id.* at 8. Tapestry Telehealth Solutions, Inc. is a holding company co-owned by Chess and Mordechai Eisenberg (Tapestry's other founder) that owns approximately 15% of Tapestry Management Services. *Id.* at 6. Other individuals and entities, including Chess, own the remainder. *Id.* After the Government served CIDs, Tapestry began billing Medicare through two additional clinical entities, Emerald Fern Wellness PC and Rosewood Hills Healthcare PC, both of which are owned by Chess. Doud Decl. ¶ 20.

Tapestry has billed more than $800 million dollars to Medicare Part B since 2020, including more than $158 million in 2026 alone. Doud Decl. ¶¶ 23-24. The vast majority of these amounts were for CCM, RPM, and BHI services. *Id.* ¶ 23. Of the amounts billed to Medicare Part B since 2020, $320 million was allowed by Medicare (the allowed amount includes the amounts paid by Medicare plus any coinsurance), and approximately $248 million was paid by Medicare. *Id.* Outside of a brief initiating patient visit—if one is even conducted—Tapestry providers generally do not interact with patients or provide them with any treatment. Instead, the purported service for which Tapestry has billed Medicare consisted primarily of the generation of reports. *See generally* Doud Decl. Ex. F at 8-9.

**D. The Civil Fraud Investigation Team's Investigation and the CIDs**

The Civil Fraud Investigation Team is investigating whether Tapestry, related entities, and/or its owners or employees submitted or caused to be submitted false or fraudulent claims for payment to government healthcare programs in connection with billing for CCM, RPM, or BHI services. The investigation includes an inquiry into whether Tapestry billed Medicare for CCM, RPM, and BHI services without complying with relevant Medicare requirements, including the requirements that the patient must receive an initiating visit with the billing practitioner if they have not been seen by them in the last year, that the patient consent to the services, and that the services be provided under the supervision of the billing practitioner. Further, the Civil Fraud Investigation Team is investigating whether the services billed by Tapestry were so deficient that they could not properly be billed to federal healthcare programs at all.

The Civil Fraud Investigation Team is conducting its investigation as a result of credible concerns regarding Tapestry's practices. For example, as required by CMS's claims submission process, Tapestry's claims to Medicare identify the purported provider that rendered the services to the beneficiary (known as the "rendering provider"). *See* CMS Form 1500, *available at* https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms1500.pdf. For years, Tapestry identified Dr. David Chess as the rendering provider on the majority of Tapestry's Part B claims. Doud Decl. ¶ 25. In 2023, for example, Dr. Chess was listed as the rendering provider on 100% of Tapestry's Part B claims, which were billed by Tapestry Telehealth PLLC, Chess Medicine PLLC, and Chess Medical P.C. *Id.* Data reviewed by the Civil Fraud Investigation team also reflects that, for years, Dr. Chess was listed as the rendering provider on more claims paid by Medicare for CCM, RPM, and BHI services than any other provider in the entire nation. *Id.* ¶ 26. Specifically, Doctor Chess was the top-ranked provider in terms of amount paid for CCM, RPM, and BHI collectively in 2022, 2023, 2024, and 2025. *Id.* Paid Medicare Part B

claims on which Dr. Chess is the rendering provider have totaled more than $140 million since 2020, including more than $45 million in 2025 and 2026. *Id*. In order to bill Medicare for these services, however, the services must have been provided under the actual supervision of the rendering physician.

Further, CMS has received complaints from and conducted interviews with numerous Medicare beneficiaries in which they stated that they did not receive the services billed by Tapestry. Doud Decl. ¶ 11. In addition, the Government also has reason to believe that Tapestry may have billed Medicare for CCM, RPM, and BHI services purportedly provided to patients who had not received initiating patient visits, did not have an established patient relationship with the provider, and/or did not provided consent for the services at issue. *Id.* ¶ 5. The Government further has reason to believe that Tapestry may have billed for CCM, RPM, or BHI services that otherwise did not meet program coverage requirements, including because Tapestry did not meet applicable thresholds for the amount of time spent providing the services. *Id.* In addition, information obtained by the Government in connection with its investigation suggests that Tapestry billed Medicare in instances where Tapestry only provided its reports to the facilities months after the time period for which Tapestry reviewed patient data, when such data was likely stale and thus had little to no value to the provision of medical care to the patients. *Id.*

On April 10, 2026, the SDNY USAO served CIDs on Tapestry Management Services, Inc., Tapestry Telehealth PLLC, Chess Medical PC, and Chess Medicine PLLC. Doud Decl. ¶ 2. On August 28, 2026, the SDNY USAO served a CID on Topaz Bay Senior Health PC. *Id.* ¶ 3. All five CIDs seek documents and interrogatory responses[2] concerning, among other things: Tapestry's business, including its employees, business locations, corporate structure and ownership; the long-term care facilities with which Tapestry contracted to provide CCM, RPM, or

[2] *See* 31 U.S.C. § 3733(a)(1) (authorizing the Government to issue civil investigative demands requiring, *inter alia*, the production of documents and answers to interrogatories).

BHI services; the beneficiaries for whom Tapestry billed CMS for CCM, RPM, or BHI services, including information concerning any initiating patient visit and whether patient consent was obtained; Tapestry's preparation of CCM, RPM, and BHI reports; Tapestry's relevant policies, procedures, and promotional and marketing materials; any complaints or investigations concerning Tapestry's practices; and relevant communications. Doud Decl. Exs. A-E.

On April 20, 2026, counsel for Tapestry contacted the Government concerning the initial four CIDs. Doud Decl. ¶ 6. That counsel indicated that their response also included documents and information in the possession of affiliated entity Topaz Bay Senior Health PC. *Id.* Over the course of the next four months, the parties engaged in discussions concerning the CIDs and Tapestry's response thereto, and Tapestry produced documents and information in response to certain of the Government's requests. *Id.* ¶¶ 6-9. These initial productions focused on "low hanging fruit" that Tapestry could relatively easily gather in response to certain requests the Government asked Tapestry to prioritize. *Id.* ¶ 6. In total, Tapestry produced approximately 3,910 documents in partial response to Interrogatory Numbers 1-3, 5, 6, 8, and 10-12 and Document Request Numbers 2-5, 7, 8, 22-25, 40 and 41. *Id.* ¶ 7. Tapestry also provided responses and objections to certain of the Government's interrogatories, though none of the entities provided sworn answers, as required. *Id.* Ex. F.

Starting in June 2026, the parties began discussing parameters for Tapestry's search of its electronically stored information ("ESI"), including emails, for purposes of responding to the document requests. *Id.* ¶ 9. As part of that process, Tapestry's counsel collected and processed the custodial data for thirty-six custodians, which included custodians that Tapestry had proposed as well as additional custodians that had been requested by the Government. *Id.* Ex. G. On August 18, 2026, at Tapestry's request, the Civil Fraud Investigation Team sent a list of proposed search strings. *Id.* ¶ 9 & Ex. H.

**E. CMS's Suspension of Payments to Certain Tapestry Entities**

CMS, in consultation with the Department of Health and Human Services Office of

Inspector General, has elected to suspend Medicare payments to certain Tapestry entities pursuant to 42 C.F.R. § 405.371(a)(2) and 42 C.F.R. § 405.372(a)(4), which permit CMS to suspend Medicare payments to providers based on credible allegations of fraud. Doud Decl. ¶ 10. CMS notified Topaz Bay Senior Health PC on February 19, 2026, that it had suspended Medicare payments to that entity, effective January 16, 2026, based on credible allegations of fraud. *Id.* ¶ 11. CMS notified Tapestry Telehealth PLLC on August 19, 2026, that it had suspended Medicare payments to that entity, effective August 11, 2026, based on credible allegations of fraud. *Id.* CMS notified Chess Medicine PLLC on August 27, 2026, that it had suspended Medicare payments to that entity, effective August 13, 2026, based on credible allegations of fraud. *Id.* CMS's decision to suspend Medicare payments to these entities was based on information that included, but was not limited to, complaints from and interviews with numerous Medicare beneficiaries in which they stated that they did not receive the services billed by Tapestry. *Id.* ¶ 11.

**F. Tapestry Stops Complying with the CIDs**

On August 19, 2026, Tapestry's counsel informed the Civil Fraud Investigation Team by email that, in light of CMS's suspension of payments to Tapestry Telehealth PLLC and Chess Medicine PLLC, Tapestry would be immediately suspending all document production efforts in response to the CIDs. Doud Decl. ¶ 12. On August 24, 2026, the Civil Fraud Investigation Team sent Tapestry a letter stating that it could not elect to discontinue its production of documents and information in response to the CIDs and notifying Tapestry that it must take all appropriate measures to ensure the retention and preservation of documents and information that may be relevant to the investigation. *Id.* ¶ 13. The Civil Fraud Investigation Team also requested that Tapestry provide information relevant to its financial condition and complete productions of certain limited categories of documents and information by September 10, 2026. *Id.*

On a telephone call on September 1, 2026, Tapestry's counsel stated that there were some documents that counsel had already collected from the company and reviewed and, although

Tapestry would produce those documents, it would not otherwise continue complying with the CIDs. *Id.* ¶ 14. Tapestry made that production, which consisted of 1,100 documents, on September 3, 2026. *Id*. On September 30, 2026, Tapestry's counsel informed the Civil Fraud Investigation Team that the decision to suspend compliance with the CIDs had been a business decision by Tapestry executives. *Id.* ¶ 15. Tapestry's counsel conveyed that, pursuant to that business decision, Tapestry had stopped ingesting data to respond to the CIDs. *Id*.

On October 8, 2026, the Civil Fraud Investigation Team followed up on its discussions with Tapestry's counsel and, *inter alia*, reiterated its requests for the documents and information the Civil Fraud Investigation Team had asked Tapestry in prior communications to prioritize. *Id.* ¶ 16. The Civil Fraud Investigation Team noted that it had asked Tapestry to prioritize information related to audits of Tapestry and its affiliates and that, while Tapestry had produced an audit log listing audits conducted of Tapestry and its affiliates and the log contains easy-to-follow hyperlinks leading to corresponding audit documentation on the company's systems, Tapestry had failed to produce the underlying audit documentation, which was clearly responsive. *Id*. On a phone call on October 9, 2026, Tapestry's counsel indicated that Tapestry would consider producing solely that one category of additional materials responsive to the CIDs. *Id.* ¶ 17. On October 21, Tapestry made a production that included some such documents as well as one spreadsheet concerning Tapestry's finances. *Id*. At that point, the Civil Fraud Investigation Team understood from Tapestry's counsel that no further efforts to comply with the CIDs were underway and no additional productions were currently planned. *Id*.

On November 2, 2026, the Civil Fraud Investigation Team met and conferred with Tapestry's counsel about the Civil Fraud Investigation Team's anticipated petition to enforce the CIDs. *Id.* ¶ 18. On the call, Tapestry's counsel did not indicate that Tapestry was currently undertaking any further efforts to respond to the CIDs. *Id.*

On November 3, Tapestry's counsel informed the Civil Fraud Investigation Team that they had spoken to Tapestry following the meet-and-confer and begun processing a production of

additional financial information requested by the Civil Fraud Investigation Team. *Id.* ¶ 19. Tapestry's counsel further stated that Tapestry was "continuing to evaluate whether there are additional responsive materials it can collect and prepare for production to you, without the burdensome expense of ESI review." *Id.* Tapestry's counsel did not commit to producing any particular materials or undertaking an ESI review. *Id.* The Government received the referenced production, consisting of one document, later on November 3. *Id.*

As of October 21, 2026, the last date on which Tapestry produced any materials in response to the CIDs, it had partially responded to the following interrogatories and document requests: Interrogatory Numbers 1, 2, 3, 5, 6, 8, and 10-12 and Document Request Numbers 2- 5, 7, 8, 22-25, 40 and 41. *Id.* ¶¶ 21. Tapestry has not responded at all to the following interrogatories and document requests: Interrogatory Numbers 4, 7, 9, 13 and 14, and Document Request Numbers 1, 6, 9-21, 26-39, and 42-46. *Id.* & Exs. A-E. Tapestry has not produced any data concerning the CCM, RPM, and BHI services it purportedly provided and has produced employees' emails or other ESI concerning only a limited number of discrete topics. *Id.* ¶ 21.

Having built a highly lucrative business billing government healthcare programs, Tapestry is now refusing to produce documents demanded as part of an ongoing civil fraud investigation into the company's billing for those services, claiming that it lacks the resources to do so. As explained more fully below, the Government seeks enforcement of the CIDs as a whole and requests that Tapestry be ordered to produce certain priority items on an expedited basis.

## ARGUMENT

The Court should enforce the CIDs. The Government easily meets the minimum standard for court enforcement of CIDs issued pursuant to the FCA: the CIDs were lawfully issued, the documents sought are relevant to the Civil Fraud Investigation Team's investigation, and it is not unduly burdensome for Tapestry to produce the materials requested. The

Government has repeatedly offered to narrow and prioritize the CID requests and to negotiate a list of custodians and targeted search terms. Tapestry has nevertheless unilaterally suspended, and declined to meaningfully resume, its production of documents and responses to the Government's interrogatories and document requests. Tapestry's counsel has declined even to continue engaging with the Government regarding search terms for the identification of responsive ESI, even though, as the Government understands it, counsel has already collected ESI for relevant custodians.

To the extent Tapestry argues that responding to the CIDs would pose an undue burden, that burden should be evaluated in the context of the scope of the conduct the Civil Fraud Investigation Team is investigating and the hundreds of millions of dollars that Tapestry has billed and been paid by the Government. Nor can Tapestry simply refuse to respond to lawfully issued CIDs on the ground that it lacks the financial resources to do so. Financial distress alone does not relieve a company of its obligation to respond to CIDs. And that is particularly true where, as here, counsel has conceded that declining to respond to the CIDs was a "business decision." Doud Decl. ¶ 15.

Tapestry's refusal to provide documents and information in response to valid CIDs threatens to undermine the Government's "important governmental interest in the expeditious investigation of possible unlawful activity," *United States v. Markwood*, 48 F.3d 969, 979 (6th Cir. 1995) (citation omitted), and its "legitimate right to [ascertain whether] corporate behavior is consistent with the law []." *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) ("*Morton Salt*"). The Government requests that Tapestry be ordered to respond to the CIDs.

## I. THE STANDARD FOR CID ENFORCEMENT UNDER THE FCA

A CID issued under the FCA is an administrative subpoena. *Markwood*, 48 F.3d at 976. The standard for enforcement of an administrative subpoena thus applies to a petition to enforce

an FCA CID and a court's role in reviewing the enforcement petition is limited. *Id.* at 975–76; *accord In re McVane*, 44 F.3d 1127, 1135 (2d Cir. 1995) (court's role in reviewing enforcement of an administrative subpoena is "extremely limited").

Enforcement of an administrative subpoena is proper when "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *McVane*, 44 F.3d at 1135 (quoting *Morton Salt* and noting that the *Morton Salt* standard has become the accepted test for judicial enforcement of administrative subpoenas); *see Markwood*, 48 F.3d at 978 (noting that, for enforcement of administrative subpoenas under *Morton Salt* and *Powell*, 379 U.S. 48, "an agency need show only that the investigation had a legitimate purpose, that its inquiry may be relevant to that purpose, that it did not already have the information and that it otherwise followed any statutory requirements"). Courts "defer to the [Government's] appraisal of relevancy, which must be accepted so long as it is not obviously wrong." *In re McVane*, 44 F.3d at 1135 (citations and quotation marks omitted).

Once the Government has advanced "a plausible argument in support of its assertion of jurisdiction, a district court must enforce [an administrative subpoena] if the information sought there is not plainly incompetent or irrelevant to any lawful purpose of the [Government]." *EEOC v. Kloster Cruise Ltd.*, 939 F.2d 920, 922 (11th Cir. 1991) (citation omitted); *see also Federal Election Comm'n v. Larouche Campaign*, 817 F.2d 233, 234 (2d Cir.1987) (per curiam) (administrative subpoena must be enforced "so long as it is for a proper purpose, the information sought is relevant to that purpose, and the statutory procedures are observed"). An affidavit from a Government official is sufficient to establish a *prima facie* showing that the requirements for enforcement are met. *McVane*, 44 F.3d at 1136.

## II. THE GOVERNMENT IS ENTITLED TO ENFORCEMENT OF THE CIDS

### A. The CIDs Were Lawfully Issued Pursuant to the FCA

Tapestry has not asserted—nor could it—that the CIDs were not lawfully issued pursuant to the FCA. The FCA is the United States' primary tool to recover losses resulting from fraud. S. Rep. No. 99-345, at 2 (1986). Congress drafted the FCA "expansively … to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003). The FCA imposes statutory damages and civil penalties for, among other things, knowingly submitting, or causing to be submitted, a false or fraudulent claim for payment or approval to the United States, 31 U.S.C. § 3729(a)(1)(A), or knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim, 31 U.S.C. § 3729(a)(1)(B). By law, the Attorney General "diligently shall investigate" alleged violations of the FCA. 31 U.S.C. § 3730(a).

Congress authorized the Attorney General to issue CIDs for documents and information in furtherance of the Department of Justice's FCA investigations. 31 U.S.C. § 3733(a)(1). The Attorney General may issue an FCA CID to "any person" it "has reason to believe . . . may be in possession, custody, or control of any documentary material or information relevant to" the Government's investigation. 31 U.S.C. § 3733(a)(1). The Government may petition to enforce an FCA CID in district court when a person fails to comply with the CID or "whenever satisfactory copying or reproduction of any material requested in such demand cannot be done and such person refuses to surrender such material." 31 U.S.C. § 3733(j)(1).

Here, the Government's issuance of the CIDs was a proper and appropriate exercise of the authority conferred by Congress. 31 U.S.C. § 3733(a). The Attorney General has delegated authority to issue FCA CIDs to United States Attorneys. 28 C.F.R. § Pt. 0, Subpt. Y, App.

Exercising that authority, the SDNY USAO issued the CIDs pursuant to the FCA, 31 U.S.C. § 3733, in the course of the Government's ongoing FCA investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729, *et seq*. Doud Decl. ¶¶ 1-3.

Tapestry has not asserted otherwise. Tapestry was lawfully served with the CIDs and did not file any petition to modify the CIDs or set them aside. Doud Decl. ¶¶ 2-3, 20; *cf.* 31 U.S.C. § 3733(j)(2)(A) (authorizing persons who have received CIDs to petition to modify or set them side). Tapestry has not raised any argument that the CIDs were not properly authorized or served and has not contested that the FCA authorizes the Government to obtain the type of information requested in the CIDs. Doud Decl. ¶ 20. Nor has Tapestry argued that the subject matter of the CIDs is outside the scope of the Department of Justice's authority to investigate. *Id.*

The CIDs thus were lawfully issued pursuant to the FCA. *See Finnell v. U.S. Dep't of Just.*, 535 F. Supp. 410, 411 (D. Kan. 1982) (noting that the "presumption of regularity has been recognized to apply to the issuance of CIDs"); *Am. Pharm. Ass'n v. U. S. Dep't of Just., Antitrust Div.*, 344 F. Supp. 9, 12 (E.D. Mich. 1971) (same).

**B. The Documents Sought Are Relevant to the Matter Under Investigation and Not Already in the Government's Possession**

The materials sought are also relevant to the Government's investigation, and the Government does not already have them. Again, Tapestry has never asserted otherwise.

Federal agencies possess an almost unfettered power of original inquiry, which they may exercise through the issuance of administrative subpoenas. *See McVane*, 44 F.3d at 1135 ("An administrative agency . . . has a 'power of inquisition' akin to that of a grand jury, which it may exercise 'merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.'") (quoting *Morton Salt*). Although information demanded by a CID must be reasonably relevant to the agency's investigation, courts are to "defer to the

[Government's] appraisal of relevancy," which "must be accepted so long as it is not obviously wrong." *Id.* The only question for the court is whether the information requested in the subpoena "touches a matter under investigation." *Sandsend Fin. Consultants, Ltd. v. Fed. Home Loan Bank Bd.*, 878 F.2d 875, 882 (5th Cir. 1989) (citation omitted).

The Civil Fraud Investigation Team is investigating whether Tapestry and/or its affiliates, owners, or employees submitted or caused to be submitted false or fraudulent claims for payment to government healthcare programs in connection with billing for CCM, RPM, and BHI services. Doud Decl. ¶ 1. Tapestry has confirmed that it offers CCM, RPM, and BHI services and that it bills government payors for those services. *See* Doud Decl. Ex. F; https://tapestryhealth.com /about-us/. Tapestry's company website states that Tapestry provides services to as many as "100k Residents" at post-acute and assisted living communities with "1,300+ Clinical Staff" in "1,700 Locations" and confirms that Tapestry's services are "billed directly to Medicare/Medicaid." *See* http://www.tapestryhealth.com/about-us. The Government has reviewed government payor claims data reflecting that Tapestry has billed more than $800 million dollars to Medicare Part B alone since 2020, the majority of which relates to the CCM, RPM, and BHI services under investigation.[3] Doud Decl. ¶ 23. Tapestry itself has readily acknowledged that it possesses a large number of documents responsive to the CIDs. *See* Doud Decl. ¶ 20.

The CIDs seek documents that are reasonably related to Tapestry's provision of CCM, RPM, and BHI services and billing of government payors for those services. The Government

[3] The $800 million figure includes claims for payment submitted to Medicare Part B only. It does not include additional claims that may have been submitted to Medicaid, TRICARE, the Federal Employees Health Benefits (FEHB) Program, or other government healthcare payors or that were submitted to Medicare Advantage Organizations pursuant to Medicare Part C.

does not already have possession of these documents and information, many of which are uniquely in Tapestry's possession. *Id.* ¶ 3.

For one, the CIDs seek patient data for patients to whom Tapestry provided CCM, RPM, and BHI services. Doud Decl. Exs. A-E, Interrogatory Nos. 7, 9. Information obtained by the Government in connection with its investigation suggests that Tapestry billed Medicare for CCM, RPM or BHI services based on its generation of reports for facilities despite the fact that Tapestry only provided such reports to the facilities months after the time period for which Tapestry reviewed patient data. Doud Decl. ¶ 5. Whether Tapestry provided such reports based on stale or useless medical information will shed significant light on whether Tapestry billed Medicare for worthless services. Tapestry's patient data is essential for determining when reports were generated and provided to facilities as compared to the time period of the medical information that was actually reviewed. The Government has also issued other requests concerning this issue. *See id.* Exs. A-E, Document Request Nos. 9, 10, 11.

The Government also has reason to believe that Tapestry may have, in violation of relevant Medicare requirements, billed Medicare for CCM, RPM, and BHI services purportedly provided to patients who had not received initiating patient visits, did not have an established patient relationship with a Tapestry provider, and/or had not provided consent for the services at issue, and correspondingly seeks documents and information concerning these issues. *Id.* ¶ 5; *id.* Exs. A-E, Interrogatory Nos. 7, 9 and Document Request Nos. 1, 3, 13, 14, 37, 38, 44. 45. The requested patient data and associated information is essential to determining the extent to which Tapestry failed to comply with basic requirements for billing Medicare, including conducting initiating patient visits, obtaining patient consent, and appropriate supervision for the services at issue. The Government likewise has reason to believe that Tapestry may have billed for services without meeting applicable thresholds for the amount of time spent providing the services and

thus seeks materials concerning time records and metrics relating to CCM, RPM, and BHI services. Doud Decl. ¶ 5; *id.* Exs. A-E, Document Request Nos. 6, 12. In light of the massive number of claims that list Dr. Chess as the rendering provider, the CIDs also include requests concerning Dr. Chess's involvement and provider supervision more generally. *Id.* Interrogatory No. 9 and Document Request Nos. 16, 17, 19, 39.

The CIDs also seek documents concerning complaints, investigations, and audits of Tapestry related to the services at issue. Doud Decl. Exs. A-E, Document Request Nos. 22, 25. These documents are highly relevant to whether the services at issue were performed in a manner that complied with applicable Medicare regulations or constituted a service of any value. While Tapestry has produced some materials concerning audits, *see* Doud Decl. ¶¶ 16-17, Tapestry's response is far from complete. For example, as far as the Government understands, Tapestry has thus far searched for materials concerning investigations or audits largely by using search terms pertaining to just one particular audit that was conducted. *Id.* ¶ 17.

Additionally, the CIDs seek information and documents concerning payments or disbursements to Tapestry's affiliates and owners, as well as information concerning Tapestry's revenues and expenses. Doud Decl. Exs. A-E, Interrogatory No. 12 & Document Request Nos. 28, 29. The Government has repeatedly followed up on these requests in light of Tapestry's assertion of financial hardship in responding to the CIDs. Doud Decl. ¶¶ 13, 16 & Ex. I. Given that Tapestry entities have been paid hundreds of millions of dollars by Medicare Part B alone since 2020, this information is highly relevant to understanding Tapestry's overall business model, potential motive, and any potential dissipation of assets in order to evade FCA liability. Further, this information is relevant to the extent Tapestry asserts that responding to the CIDs poses an undue financial burden, and to the extent Tapestry may ultimately claim that it lacks the

funds to pay damages and penalties under the FCA. Yet Tapestry has refused to provide the majority of the requested financial information.

Various of the Government's requests seek information concerning the way Tapestry operates and performs the purported CCM, RPM and BHI services at issue, including its business locations; its corporate structure; its ownership; the services it provides; the platforms it uses; its employees; the facilities with which it contracts to provide the services at issue and any payments made to or received from those entities; the way it marketed its CCM, RPM, and BHI services; the process by which it submits claims for payment to Government programs; and its document retention policy and compliance program. *See* Doud Decl. Exs. A-E, Interrogatory Nos. 1-6, 8, 10, 11, 13, 14; Document Request Nos. 2, 4, 5, 15, 23, 30, 31, 34, 35, 36. Certain requests also seek contracts and communications with BetCo LTC Consulting LLC, with which Tapestry contracted to prepare CCM, RPM, and BHI reports, and its principals. *Id.*, Document Request Nos. 7, 8.

The CIDs also include requests concerning various other relevant issues, including the point of service used for billing the services at issue, which is relevant to whether they met applicable requirements; federal healthcare program criteria and requirements for the services at issue; documents related to fraud, waste, and abuse; documents related to potential investments in or sales of Tapestry, in which the services at issue would likely have been discussed; and reports and meeting minutes from business metrics meetings and board of director meetings, which would likely include representations concerning Tapestry's performance and the services at issue. Doud Decl. Exs. A-E, Document Request Nos. 18, 20, 21, 24, 26, 27, 33, 40, 41.

Finally, many of the Government's requests seek communications and other ESI concerning potential issues with the CCM, RPM, and BHI services Tapestry purportedly provided, including, for example, the timeliness of reports, the extent to which initiating patient

visits were conducted, the amount of time purportedly spent creating the reports, and the extent to which patients provided consent for the services. Doud Decl. Exs. A-E, Document Request Nos. 9-14, 17, 19, 32, 37, 42-46. Such communications and ESI are essential to the Government's investigation, including with respect to Tapestry's scienter and identifying the individuals involved in the conduct at issue.

Thus, the information and documents sought in the CIDs are reasonably relevant to the Government's investigation and should be produced. *See generally United States v. Firestone Tire & Rubber Co.*, 455 F. Supp. 1072, 1083 (D.D.C. 1978) ("The agency need not narrow its focus from the beginning, and it is not for [the] court to determine whether the information sought is relevant to whatever eventual action the agency might take."); *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 216 (1946) (agency's investigation should not be "limited . . . by forecasts of the probable results of the investigation . . ." (citation omitted)); *FTC v. Texaco*, 555 F.2d 862, 874 (D.C. Cir. 1977) ("The district court is not free to speculate about the possible charges that might be included in a future complaint, and then to determine the relevance of the subpoena requests by reference to those hypothetical charges.").

**C. It Is Not Unduly Burdensome for Tapestry to Produce Responsive Materials**

As the recipient of the CIDs, Tapestry bears the burden to show that compliance would be unduly burdensome or unreasonable. *SEC v. Brigadoon Scotch Distr. Co.*, 480 F.2d 1047, 1056 (2d Cir. 1973); *see United States v. Time Warner, Inc.*, No. MISC.A. 94–338 (HHG), 1997 WL 118413, at *6 (Jan. 22, 1997 D.D.C.) (enforcing CID); *Texaco, Inc.*, 555 F.2d at 882. Where the investigation "is authorized by law and the materials sought are relevant to the inquiry, that burden is not easily met." *Brigadoon*, 480 F.2d at 1056.

Here, the CIDs are not overbroad or unduly burdensome, particularly when viewed in light of the magnitude of the potential harm at issue and the Government's repeated efforts to

narrow and prioritize the requests. The CIDs at issue cover a defined time period that is not broader than the time period under investigation. Specifically, the CIDs seek documents and information dating back to 2017, when the Government understands Dr. David Chess and Mordechai Eisenberg founded Tapestry. *See* Doud Decl. Ex. F.[4] The CIDs seek specific categories of information and documents that should be available on Tapestry's systems and either relate directly to the services at issue or provide necessary context concerning Tapestry's operations.

Further, the Civil Fraud Investigation Team has offered repeatedly to prioritize certain requests and negotiate with Tapestry concerning its response to the CIDs, to ensure that Tapestry could respond without any undue burden. *See* Doud Decl. ¶¶ 6-9. The parties were productively engaging in such negotiations at the point Tapestry unilaterally suspended its CID compliance. To take one example, the Civil Fraud Investigation Team requested documents from only a limited list of company personnel. Tapestry has represented to the Government that it had at least 3,321 employees or other personnel who worked at the company during the time period under investigation. *Id.* ¶ 9. Of those more than three thousand employees or other personnel, the Government requested that Tapestry collect ESI for only thirty-six individuals. *Id.* Tapestry itself selected approximately half of those individuals, or eighteen personnel, and the Government selected the remainder. *Id.*

To take another example, at Tapestry's request, the Government drafted and provided Tapestry with a narrow set of twenty-two search strings for use in gathering responsive documents from the custodians. *Id.* The search strings are generally limited to Tapestry's CCM,

[4] While the Government's understanding is that Tapestry shifted its focus to CCM, RPM, and BHI services over time after Tapestry's founding, the Government seeks materials back to 2017 to capture discussions and decisions concerning the manner in which Tapestry elected to offer those services.

RPM, and BHI services, and each search string is constrained using specific terms, search connectors, and Boolean operators, so that the searches will return only those documents with a very high likelihood of being responsive to the CIDs. *Id.* ¶ 9 & Ex. H. Tapestry never objected to the terms or offered any responsive edits, or, as far as the Government is aware, ran them across the ESI Tapestry's counsel had collected. *Id.* Tapestry's counsel has offered no response at all to the Government's proposed search strings. *Id.*

Rather than engaging with the Government on the search strings, or Tapestry's compliance with the CIDs more generally, Tapestry's counsel instead sent an email on behalf of Tapestry stating that Tapestry and its affiliates would "stop all document production efforts immediately" based on CMS's decision to suspend payments to two Tapestry entities. Doud Decl. ¶ 12. Tapestry's counsel later conceded during a meet and confer call that Tapestry's refusal to produce documents and information in response to the CIDs was "a business decision" made by certain executives at the company. *Id.* ¶ 15. Tapestry has declined to meaningfully resume its production of documents and information or to engage with the Government regarding the search terms for review of ESI.

Tapestry's asserted reason for refusing to further respond to the CIDs is the payment suspension implemented by CMS, in consultation with HHS-OIG, based on the agency's finding of credible allegations of fraud. Purported financial distress, however, is not a valid basis to refuse to produce any materials responsive to a valid CID. *See, e.g.*, *Watson*, 2023 WL 11952996, at *9 (noting that recipient of grand jury subpoena "is neither the first corporation, nor even the first corporation in some state of financial distress, to receive a subpoena. The obligation to respond fully and promptly remains in such cases"). Further, Tapestry has not credibly demonstrated that it lacks the ability to respond to the CIDs. Notably, Medicare has only withheld a total of approximately $4.77 million in payments to Tapestry and its affiliates to

date. *Id.* ¶ 27. Against the backdrop of Tapestry having claims allowed by Medicare Part B that total approximately $320 million since 2020, including approximately $68 million since the beginning of 2026, *id.* ¶¶ 23-24, it is highly unlikely that Tapestry and its affiliates are unable to respond to the CIDs at this time unless a significant dissipation of funds and assets has occurred, at least partially since the issuance of the CIDs. The Government has requested information from Tapestry concerning any such transfer of assets, but Tapestry has declined to provide it.

Absent evidence that concretely establishes Tapestry and its affiliates' actual inability to respond, the Court should view any assertion of undue burden based on Tapestry's financial condition skeptically in light of CMS's finding of credible allegations of fraud and the hundreds of millions of dollars Tapestry has been paid by Medicare in the recent past. *See United States v. Witmer*, 835 F. Supp. 208, 220 (M.D. Pa. 1993) (rejecting claims of undue burden "in the context of [an] investigation involving an alleged $47 million fraud"); *Firestone Tire & Rubber Co.*, 455 F. Supp. at 1083–84 (enforcing subpoena despite the company's allegation that compliance would require 100,000 hours of time and cost $2 million).

When Tapestry unilaterally suspended its compliance with the CIDs, Tapestry's counsel had already collected ESI for the relevant custodians. Doud Decl. ¶ 9. Yet Tapestry refuses to produce even the ESI that its counsel already collected. To start, the non-privileged documents that Tapestry's counsel have already collected in response to the CIDs should be produced as soon as possible, along with a few other categories of documents and information the Government views as essential to its ability to continue its investigation.

Accordingly, if the Court grants the Government's petition to enforce the CIDs, the Government respectfully requests that the Court issue an order that:

(1) Tapestry produce, within thirty days: (i) sworn interrogatory responses in response to the following Interrogatories: 7, 9, and 12; and (ii) all non-privileged documents responsive to Requests for Production Nos. 22, 25, 28, and 29;

(2) Tapestry produce, within sixty days, all non-privileged electronically stored information responsive to the CIDs that Respondents' counsel has already collected, whether or not it has been processed for production; and

(3) Tapestry produce, within ninety days: (1) sworn interrogatory responses to all remaining Interrogatories in the CIDs; and (2) all non-privileged documents responsive to the remainder of the Requests for Production in the CIDs.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court grant the Government's petition to enforce CIDs 26-014, 26-015, 26-016, 26-017, and 26-036. The Government further requests that the Court order Tapestry to provide responses to the interrogatories and document requests according to the schedule set forth above.

Dated: New York, New York
November 3, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: */s/ Rachael Doud*
RACHAEL DOUD
CHIBOGU NZEKWU
Assistant United States Attorneys
Tel.: (212) 637-2699/2737
E-mail: rachael.doud@usdoj.gov
chibogu.nzekwu@usdoj.gov

## Certificate of Compliance

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 8,142 words.